**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

FILED & ENTERED

SEP 28 2012

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Gonzalez DEPUTY CLERK

In re:

Robert Sjoquist

                                    Debtor(s).

Case No.: 1:08-bk-12023-GM

CHAPTER 7

**MEMORANDUM OF OPINION REGARDING
MOTION TO DISALLOW THE CLAIM OF
ERIKA SJOQUIST [DOCKET 99],
MOTION TO COMPEL TRUSTEE TO
ABANDON [DOCKET 102], AND
MOTION TO COMPROMISE [DOCKET 108]**

Date: September 11, 2012
Time: 10:00 a.m.
Courtroom: 303

## Background

This litigation centers on a note (the "Note") and other contract rights that the

debtor ("Debtor" or "Robert") received on account of the sale of his business in 2001.

Debtor and his wife ("Erika") divorced in 2007 and Debtor assigned the payments from

the Note to Erika in lieu of child and spousal support. (She received some payments on

the Note, but the buyers of the business ultimately stopped paying in 2009.) Over the

course of the next five years, Robert and Erika each filed for chapter 7 relief (at different

times and in different divisions), entered into two separate court-approved agreements

with Debtor's trustee ("Trustee") over entitlement to the proceeds of the Note and

responsibility for enforcing the Note, and entered into a new support and child custody

arrangement in Superior Court. Trustee has now brought a motion for approval of a

compromise with the buyers of Debtor's business, which Debtor opposes.  Debtor has

brought a motion to compel Trustee to abandon the Note and other contracts rights from

the sale of the business, on the grounds that they are an executory contract that trustee

has rejected by operation of law.  Debtor has also brought a motion to disallow Erika's

claim.

The details of this history are set forth in the following timeline:


8/17/01 - Robert enters into a Stock Purchase Agreement with Skyline Displays

Northwest, LLC and Jeff and John Backstrom (collectively, the "Purchasers") to sell

them his shares in Sales Presentations Northwest, Inc. ("SPNW") for $1.83 million,

payable over a period of years.  The Stock Purchase Agreement refers to a number of

ancillary documents, including the Note and an Employment and Noncompetition

Agreement (the "Employment Agreement").  (The Stock Purchase Agreement and all

such ancillary documents are collectively referred to as the "Sales Agreement.")  Under

the Sales Agreement, Robert was to be employed as a salesman and management

assistant with a monthly salary of $5,000 ("Salary Payments"), until the outstanding

balance owing on the Note fell below $650,000.  Employment Agreement ¶¶ 3 & 4.

12/6/07 - Erika files for dissolution, Ventura County Superior Court Case

D324378.

12/13/07 - Erika and Robert enter into the "Stipulation for Child and Spousal

Support and Order Thereon," which is signed by the Superior Court judge.  Under this

agreement (the "Family Law Settlement Agreement"), Robert is relieved of all child and

spousal support obligations in exchange for assigning all proceeds of the SPNW note to

Erika (65% for child support, 35% for spousal support).  From 11/07 to 5/08, Erika

1

receives $95,272.50 in payments from the Note.

2

4/3/08 - Robert files this chapter 7 case.  The Trustee asserts entitlement to both

3
4

the Salary Payments and the payments under the Note.  Pursuant to a preliminary

5

injunction issued by this court, the Trustee receives $80,112.90 in Note payments and

6

$18,543.12 of Salary Payments.

7

Late 2008 – Purchasers stop making Salary Payments or payments on the Note.

8

2/13/09 - Erika files claim 11-1 in Robert's bankruptcy case for a priority claim

9
10

under §507(a)(1) and §507(a)(8) of $1,449,129.60.  The claim is for child and spousal

11

support from 11/1/07-9/5/19 (based on the dissomaster calculation of 10/29/08 using

12

data from Debtor's wage-earning history and including all expenses), plus

13

reimbursement of a number of enumerated expenses, including some child expenses,

14

mortgage payments, tax payments, attorneys' fees and judgments.

15

4/17/09 – This Court approves a compromise between the Trustee, Robert and

16
17

Erika under which the Trustee is authorized to enter into the Settlement Agreement and

18

Release with defendants in an avoidance action: Robert, Erika, the Purchasers, SPNW,

19

and Olympic Heights Investments (1:08-ap-01328-GM). Under the terms of this

20

agreement (referred to as the "Fraudulent Transfer Settlement Agreement", the Trustee

21

is to receive 65% of all payments from the Note due and paid from 11/30/07, while Erika

22
23

keeps the other 35%. Trustee is also to receive 65% of all of the Salary Payments due

24

and paid from 4/3/08, with the balance going to Robert.

25

3/11/10 - This Court approves a Litigation Agreement between Robert, Erika, and

26

the Trustee.  The Purchasers are in default on the Fraudulent Transfer Settlement

27

Agreement, so the Trustee grants Robert and Erika the authority to sue and to manage

28

the legal action against the Purchasers.  Robert and Erika are to advance all litigation

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

expenses and attorneys' fees, but will be reimbursed if successful.

6/22/10 - Erika files a chapter 7 case in the Santa Barbara Division (9:10-bk-13146-RR).

2/2/11 - Erika receives her bankruptcy discharge.

3/23/12 - Robert and Erika stipulate in the Superior Court concerning the location and education of their child and that spousal support from 12/20/11 will be reduced to $0 and child support from that same date will be payable at a set amount [the court cannot tell from Ex. B what that amount is].  It also provides that because Robert has contributed to the attorney's fees and costs, his first support payment will be due 5/1/12.

## Debtor's Motion to Disallow Erika's Claim

Motion

Debtor argues that  the claim has been satisfied by the original 2007 stipulation, which allocated the proceeds and income from the Note to Erika, to be divided between child support (65%) and spousal support (35%).  The debtor asserts that it was up to the Erika to enforce the Note and related agreements, but she has not done so.  Debtor has paid over $20,000 to counsel in Washington to enforce the terms of the Note and related agreements, while Erika made no payment and rendered no material assistance.  Debtor also argues that in March 2012 the debtor and Erika stipulated to reduce spousal support to $0 and child support to $984 per month.  (Debtor also argues that the Litigation Agreement is an executory contract that was rejected by operation of law.  The court will discuss this issue in considering Debtor's Motion to Compel Abandonment below.)

Erika's Opposition

The claim is supported by documentation.  It shows over $1 million of past-due support payments. As to the divorce settlement, that only deals with future support payments from 12/11, not prepetition ones.

Trustee's Limited Opposition

Although Debtor has a right to object to the claim, Trustee believes that it is premature since this may be an administratively insolvent estate and the litigation in Washington is still pending.  As to the asserted amount of the claim, the $1,449,129.60 amount is not broken down or supported in a way that the Trustee can determine if it is correct.  And if the Debtor did satisfy the claim, then the claim will be moot.

Debtor's Reply to Erika's Opposition

The claim should be limited to the amounts owing as of the petition date and contains no evidence supporting the amount of $8,190 for monthly child support and alimony.  Since the dissolution action was filed on 12/6/07, the claim should only be for a four month period.  The settlement agreement is res judicata as to the amount of child support and alimony owed to Erika.  The amounts Erika received under the Note ($95,272.50) have satisfied the prepetition obligation. as well as any post-petition amounts until the 3/12 stipulation, since they were based on the payments under the Note.  The new stipulation established the child support at $984 and no spousal support, commencing 12/20/11.  They were to advance litigation expenses.  Clearly this is an executory contract since performance is due on both sides.  This contract was never assumed.

Trustee's Reply to Erika's Opposition

The objection to the claim is premature because the estate is insolvent.  Also the Trustee questions the validity of the stipulation in the dissolution action since Debtor asserts that the obligation has been fully satisfied.  And lastly, even if the stipulation is valid, most of the claim deals with the debtor's post petition obligation.  The Litigation Agreement did not require Robert and Erika to pursue legal action against the purchasers of the business, but they were to keep the Trustee advised and to seek approval from the Trustee as to any settlement.

Analysis and Ruling on Motion to Disallow Erika's Claim

Section 507(a)(8) does not apply because Erika is not a "governmental unit."

The claim can only be for amounts owing up to the date of bankruptcy.  At the present time it is unclear what this should be.  The newest settlement in the Superior Court does not cover this, since it only deals with certain post-petition amounts.  The Family Law Settlement Agreement would seem to mean that no pre-petition amounts are owed, but the Fraudulent Transfer Settlement Agreement changes that formula and thus may impact the effectiveness of the Family Law Settlement Agreement.  Unless the parties get a new ruling from the Superior Court as to the amount due from the date of the filing of the dissolution until the date of Robert's bankruptcy, the Family Law Settlement Agreement stands and Erika is owed nothing more as a prepetition creditor.

The Court does not wish to foreclose Erika's opportunity to go to family court and receive a determination of these issues.  The motion to disallow is granted with leave to amend no later than January 31, 2013.

### Debtor's Motion to Compel Abandonment

Motion

Debtor moves the Court for an order compelling the Trustee to abandon the
Stock Purchase Agreement, including the Note, the Employment Agreement, and
personal guaranties that came out of the prepetition sale of SPNW. The Stock
Purchase Agreement required that Debtor would remain as an employee and director
emeritus of SPNW and he had continuing duties thereunder, as did the Purchasers.
The Stock Purchase Agreement is an executory contract and was not assumed by the
Trustee, so it has been rejected pursuant to Bankruptcy Code §365(d)(1). Abandoned
property reverts to Debtor. Erika's trustee never assumed the Litigation Agreement, so
that has been rejected in her bankruptcy and it was never assumed in this bankruptcy.

Opposition

Trustee, joined by Erika, opposes Debtor's motion on the grounds that the Stock
Purchase Agreement is not an executory contract. Debtor had already fully performed
prepetition by selling his stock. Because Debtor never performed any work for SPNW
under the Employment Agreement, the Salary Payments received were actually part of
the purchase price for the shares of stock. To be executory, some performance must
remain due on both sides. All that remained was for the Purchasers to pay, so this is
not executory. Alternatively, Debtor has waived any rights to challenge the Sales
Agreement as an executory contract when he entered into the Fraudulent Transfer
Settlement Agreement over 3 years ago. The Sales Agreement is not burdensome to

the estate or of inconsequential value, so there is no reason to abandon under §554(b).

Debtor's Reply

Debtor argues the Note is part of an executory contract. There are 10 agreements that are part of the Stock Purchase Agreement and the Note was only one of them.  There are duties still to be performed by all Parties as part of the total Sales Agreement.  Furthermore, Debtor cannot waive the time to assume.

Debtor also argues that enforcing the Note would be burdensome to the estate, but that the Trustee has unfairly foisted that burden on Debtor to date.  Basically the Trustee has done nothing.  If he wants to preserve and maintain these property rights, he needs to start paying the administrative costs of pursuing of the Washington action. Since the Trustee has no money to pay these costs, they are burdensome to the estate and the Sales Agreement should be abandoned.

Analysis and Ruling on Motion to Compel Abandonment

**Fraudulent Transfer Settlement Agreement and Litigation Agreement**

Neither the Fraudulent Transfer Settlement Agreement nor the Litigation Agreement are executory contracts in that they are both post-petition.  Further, the Trustee is a party to both of them, so he does not need to assume them even if they were pre-petition (which they aren't).  To the extent that Debtor is seeking an order compelling theTrustee to abandon these agreements, the motion is denied.

**Stock Purchase Agreement**

The various documents that comprise the Sales Agreement must be taken as

one contract.  The Stock Purchase Agreement, in fact, not only refers to the Note and

Employment Agreement, but contains actual promises to pay the monies due under

those documents.  See Exhibit A to Motion to Compel. If the Sale Agreement, taken as

a whole, is an executory contract, then it is deemed rejected, pursuant to §365(d)(1),

because Trustee failed to assume it within 60 days of Debtor's 4/3/08 chapter 7 filing.

Executoriness is a question of federal law.  *See, e.g.,* Griffel v. Murphy (In re

Wegner), 839 F.2d 533, 536 (9th Cir. 1988).  The Ninth Circuit uses the Countryman

test for "executoriness," essentially that there is material performance due on both sides

of the contract at the petition date:

> The Ninth Circuit adopted the "Countryman" test to determine whether or not a
> contract is "executory", for bankruptcy purposes. Under this test, a contract is
> executory if, when the bankruptcy petition is filed, "the obligations of both parties
> are so unperformed that the failure of either party to complete performance would
> constitute a material breach and thus excuse the performance of the other."

Unsecured Creditors' Committee v. Southmark Corp. (In re Robert L. Helms Constr. &

Dev. Co.), 139 F.3d 702, 705 (9th Cir. 1998) (quoting Griffel v. Murphy (In re Wegner),

839 F.2d 533, 536 (9th Cir. 1988)).

Courts have defined "material performance" as "the essence of what the other

party sought and expected when he entered into the . . . Agreement, and without it, the

party will lose the benefit of the bargain that he thought he had struck."  In re Worldcom,

343 B.R. 486, 496-97 (Bankr. S.D.N.Y. 2006)(quoting In re Teligent, 268 B.R. 723, 730-

31 (Bankr. S.D.N.Y. 2001)).  In a similar vein, material performance has been defined

as the "bargained for" objective or consideration.  *See, e.g.,* In re Conseco, Inc., 2005

U.S. Dist. Lexis 24584 at 15 (N.D. Ill. 2005), *aff'd* 458 F.3d 573 (7th Cir. 2006)(applying

Indiana law); In re Waldron, 36 B.R. 633, 637 (Bankr.  S.D. Fla. 1984).  Some courts,

such as the Seventh Circuit in Conseco, have turned to applicable state contract law.

The Sales Agreement is governed by Washington law (Stock Purchase Agreement

¶9.6), which defines material breach as one "serious enough to justify the other party in

abandoning the contract . . . one that substantially defeats the purpose of the contract."

Park Ave. Condo v. Buchan Devs., 117 Wn. App. 369, 71 P.3d 692 (Wash. Ct. App.

2003)(quoting 6A Wash. Pattern Jury Instructions: Civil 302.03, at 127 (1997).

It is undisputed that, on the 4/3/08 petition date, Purchasers had material

performance remaining under the Sales Agreement: they owed at least $750,000 under

the Note, as well as salary and fringe benefit obligations under the Employment

Agreement.  The question is whether Debtor also had material performance obligations

remaining.  Debtor had long before delivered his equity interest in SPNW to the

Purchasers, so any remaining obligations were under the Employment Agreement (Exh.

H to Motion to Compel), which would continue in effect until the Note was paid down

below $650,000:

> Employee shall be employed as a sales professional and management assistant.
> Employee shall act as a sales representative of Employer's products and services,
> and shall also be periodically available to provide management advice, share the
> benefit of his experience as a manager of Employer, and answer questions
> concerning the same.  Employee shall devote a reasonable amount of Employee's
> business time, attention, energy and skill to the business of Employer, but Employee
> may engage in any other gainful employment or self-employment without the prior
> consent of Employer, so long as it does not violate the terms of this Agreement or
> materially limit Employee's ability to satisfy his obligations hereunder.

Employment Agreement ¶2; *see also* Stock Purchase Agreement ¶5.5.

In addition, during his employment, Debtor had non-compete and confidentiality

obligations under the Employment Agreement.  Employment Agreement ¶¶ 6, 7.  The

Stock Purchase Agreement also provides for Debtor to serve as a "non-voting director

emeritus" of SPNW during his employment.  Stock Purchase Agreement ¶5.5.

Debtor's emeritus directorship cannot be material performance which was still

due by Debtor under the Sales Agreement, because the Stock Purchase Agreement

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

treats it is as a right of Debtor's, rather than an obligation:  "Sjoquist **shall be entitled to**

serve as a non-voting director emeritus . . . ."  Stock Purchase Agreement ¶5.5.  Thus,

the court must determine whether any of Debtor's actual duties, which remained due at

the 4/3/08 petition date (almost seven years after execution of the Sales Agreement),

were bargained for objectives of the Purchasers when entering into the Sales

Agreement.  Under the Sales Agreement these were both the restrictive non-

competition and confidentiality covenants, as well as affirmative sales and managerial

duties.

    A majority of cases have held that restrictive covenants in employment contracts,

such as non-compete, confidentiality and non-interference, are not sufficiently material

to render a contract executory under the Countryman test. Shults & Tamm v. Brown (In

re Hawaiian Telcom Communs., Inc.), 2012 Bankr. LEXIS 380 at 11 (Bankr. D. Haw.

Jan. 30, 2012)("The majority of cases examining non-competition and non-solicitation

obligations hold that these provisions are not sufficiently material under the Countryman

test."); *see, e.g.,* In re Spectrum Info. Technologies, 190 B.R. 741, 749-50 (Bankr.

E.D.N.Y. 1996)( (non-debtor employees' duties of non-competition, confidentiality,

public statement and non-interference insufficient);  In re Drake, 136 B.R. 325 (Bankr.

D. Mass. 1992)((employment agreement arising from sale of debtor's business non-

executory, where debtor's only duty is non-competition); In re Bluman, 125 B.R. 359

(Bankr. E.D.N.Y. 1990) (debtor's non-compete covenant and agreement to assist buyer

for year after sale of debtor's business did not render agreement executory).  Non-

materiality is not an automatic conclusion: on reconsideration, the bankruptcy court in

Shults & Tamm gave parties an opportunity for discovery and briefing on materiality.

2012 Bankr. LEXIS 1417, 3-4 (Bankr. D. Haw. Apr. 2, 2012).

However, in the case before me, Debtor has presented no evidence that these

provisions were material to Purchasers.  Even if Debtor's non-compete and

confidentiality covenants had been a "bargained for objective" of Purchasers in the 2001

Sales Agreement, it is difficult to imagine that in 2001, it was a material inducement to

the Purchasers that the Debtor would be barred from competing or disclosing

confidential information seven or more years after they took over ownership of the

company.

Debtor's affirmative duties as a salesman and managerial assistant might be

more likely to be found material, but Debtor has not presented evidence or even

asserted that he performed any sale or managerial duties for the company under the

Employment Agreement since the 2001 sale.  In In re Spectrum Info. Technologies, 190

B.R. 741 (Bankr. E.D.N.Y. 1996), the court found that similar continuing consulting

obligations of previously-terminated employees were insufficient to render their

separation agreements executory:

> The Musacchio and Silver Separation Agreements distinctly provide for
> Musacchio's and Silver's engagement as consultants for two-year terms ending on
> March 31, 1996 and on or about May 10, 1996, respectively. These consulting
> services include assisting Spectrum with investor relations and various aspects of
> existing and potential business relationships. Notably, the parties expressly agreed
> that "in no event shall [Musacchio and Silver] be required to spend more than three
> hours per week in rendering the consulting services. . .[or] more than  100 hours of
> services during any twelve month period. . . ."
> Notwithstanding the de minimis requirement for such consulting services, the
> consideration therefor, in both cases, is stated to be the termination payments
> described above.  Musacchio is also entitled to additional compensation "in an amount
> to be agreed upon" by the parties in writing as well as stock options for the purchase of
> Spectrum's common stock. Silver was granted additional compensation "in a manner
> and in an amount in accordance with the custom and practice of the industry" together
> with stock options.
> ....
> However, this Court finds that the continuing consulting obligations are de
> minimis and insufficient to render the Separation Agreements executory in light of the
> minute amount of time Spectrum required Musacchio and Silver to perform such
> services together with the fact that the consulting services were not required to be
> rendered at Spectrum's offices or other location selected by Spectrum, nor were
> Musacchio or Silver prohibited from accepting full time employment during the term of

1    the consulting agreement provided such employment did not violate the restrictive
     covenants.

2         It is clear to this Court that the de minimis consulting requirement was not the
     material purpose underlying the Separation Agreements which was to terminate valid

3    and subsisting employment agreements. Thus, a failure by Musacchio or Silver to
     render such services would likely be considered a minor departure for which Spectrum

4    would be entitled to claim damages for whatever loss had been sustained, rather than
     a material breach justifying a discharge of Spectrum's obligation to make termination

5    payments.

6         Thus, the Court finds that there are no remaining material obligations on the part
     of Musacchio and Silver. As previously noted, Spectrum's obligations to make

7    termination payments and to indemnify are insufficient to render these Separation
     Agreements executory. Accordingly, this Court concludes that the Musacchio and

8    Silver Separation Agreements are not executory contracts and are not subject to
     rejection under section 365.

9    Spectrum Info.,190 B.R. at 751.

10        Like the consulting obligations in Spectrum, Debtor was not prohibited from

11   accepting full-time employment elsewhere nor was Debtor required to render the

12   services at SPNW's place of business.   The Spectrum court identified the key inquiry

13   for these cases:  this employment was simply not a material purpose underlying the

14   Sale Agreement (evidenced by the fact that Purchasers apparently sought little or none

15   of Debtor's services) and Debtor's failure to perform at most would have entitled

16   Purchasers to a claim for damages.  The immateriality of Debtor's services is reinforced

17   by the fact that Debtor was paid the same amount regardless of services performed.

18   Finally, much like the restrictive covenants, it is difficult to imagine that Debtor's post-

19   4/3/08 services as of the  4/3/08 petition date (utilizing experience that would be seven-

20   years-out-of-date) would have been sought by, or have any value to, Purchasers in

21   2001.

22        An Arizona bankruptcy court did decide that an employee's obligations to his

23   previous employer were sufficiently material to make their agreement executory, but this

24   case is distinguishable by that court's emphasis on employee's actual performance of

25   these obligations:

1

2        While it is apparent that Debtor was seeking to limit Mullis' role with the company,
        it did not expressly terminate the relationship in the Settlement Agreement. And,
3        certainly, Debtor never terminated Mullis under the terms of the Employment Agreement.
        More important, Mullis still had responsibilities to Debtor he had to perform. For
4        example, Mullis still had to forego acting as an outside consultant unless he received
        approval from the Board and the work did not conflict with Mullis' current Board
5        obligations. Mullis still served on the Board and could be required by Debtor at any time
        to perform various obligations to the company at the Board's request, although the Board
6        also reserved the right not to have Mullis involved in the day-to-day operations of the
        company. Mullis did not resign this Board position until June 30, 1996. Further, Mullis
7        continued to be the Resident Management Employee, thereby allowing Debtor to
        conduct business lawfully in various states. The Trustee does not dispute Mullis' claim
8        that he attended Board of Directors' meetings from April, 1996, to June, 1996, as a
        member of the Board. Nor does the Trustee dispute that Mullis helped Debtor sell some
9        of Debtor's assets during this bankruptcy to some of Mullis' industry contacts. In turn,
        Debtor still agreed to pay Mullis his salary and various benefits and expenses.
10        Thus, the contract was executory.

11

12 In re Bryant Universal Roofing, 218 B.R. 948 (Bankr. D. Ariz. 1998).  Unlike this Debtor,

13 the employee in Bryant actually attended board meetings and helped his employer sells

14 some assets.

15        It is also possible that the $5,000 salary paid to Debtor for many years, whether

16 or not he performed any work under the Employment Agreement is merely a clever

17 allocation of the purchase price done for tax purposes or other structuring issues.  *See,*

18 *e.g.,* In re Drake, 136 B.R. 325, 327 (Bankr. D. Mass. 1992)("Trustee . . . argue[s] that

19 the Agreement [paying debtor $6,250/month for 60 months in exchange for non-

20 compete covenant] is a disguised buy-sell for tax purposes"; agreement held non-

21 executory).

22

23        Even if the Sales Agreement was held to be executory and thus deemed rejected

24 under §365(d)(1), that rejection does not effectively abandon it to Debtor.   Some courts

25 have held, as Debtor argues, that rejection removes the contract from the estate, so that

26 control reverts back to the Debtor.  *See, e.g.,* Stoltz v. Brattleboro Housing Authority,

27 259 B.R. 255, 258 (D. Vt. 2001), aff'd 315 F.3d 80 (2d Cir. 2002); In re Scharp, 463 B.R.

28

1    123 (Bankr. C.D. Ill. 2011).  However, this conclusion seems contrary to the language of

2    §365(g).  This court accordingly agrees with a Ninth Circuit affirmation on this issue:

3
4        Contrary to debtor's contention, rejection does not "revest" the contract in the
         debtor, and it does not "divest" the estate of the rights that a breaching party has under
5        the applicable state law governing contracts, *see* OneCast, 439 F.3d at 563 (quoting In
         re Thompson-Mendez, 321 B.R. 814, 819 (Bankr. D. Md. 2005)); rather, the rejected
6        executory contract remains property of the estate, but it is unenforceable against the
         estate. Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings, Inc.),
7        148 B.R. 194, 203 (Bankr. S.D.N.Y. 1992)); *see* In re Thompson-Mendez, 321 B.R. at
         820 ("an executory contract or unexpired lease that is rejected under 11 U.S.C. §
8        365(d)(1) is breached, but is not abandoned" and "the debtor's interest in the [contract
         or] lease remains property of the estate"); *see also* In re Henderson, 245 B.R. 449, 453-
9        54 (Bankr. S.D.N.Y. 2000) (absent direct or formal abandonment of a residential lease,
         the lease remains property of the estate even though it was rejected by the trustee).

10   In re Phillips, 2010 U.S. Dist. LEXIS 89834, 8-9 (W.D. Wash. July 30, 2010), aff'd 460

11   Fed. App'x 636 (9th Cir. 2011); *see also* First Ave. West Bldg. LLC v. Jones (In re

12   OneCast Media, Inc.), 439 F.3d 558, 563 (9th Cir. 2006) ("The statutory breach of

13

14   contract simply put the estate in the position of a breaching party to the executory

15   contract. Rejection under the Bankruptcy Code did not divest the estate from the

16   breaching party's rights under the terms of the contract and applicable state

17   law.")(quoting In re Thompson-Mendez, 321 B.R. 814, 819 (Bankr. D. Md. 2005).)

18   .       Even if the Sales Agreement was an executory contract subject to rejection by

19   operation of  §365(d)(1)  and even if such rejection would revest the Sales Agreement in

20   Debtor, Debtor has entered into two separate **post-petition** agreements with Trustee

21   allocating rights under the Sales Agreement.  In the Fraudulent Transfer Settlement

22   Agreement, the Trustee and Debtor agreed that the Trustee would receive 65% of all

23   Salary Payments from 4/3/08.  Exhibit A to Motion for Authority to Compromise ¶II.A.  In

24   this same agreement, Erika and the Trustee agreed that Trustee would received 65% of

25   all payments due under the Note from 11/30/07.  Id.  The 2010 Litigation Agreement,

26   which Debtor also executed, recited these allocation provisions from the Fraudulent

27

28

Transfer Settlement Agreement and provided that they were "true and correct" and "incorporated by reference." Exhibit B to Motion for Authority to Compromise ¶1. In these post-petition agreements, which are binding on Debtor and enforceable against him without regard to assumption or rejection, Debtor clearly agreed to transfer his rights to 65% of the Salary Payments to Trustee.

And, while he did not expressly agree to Trustee receiving 65% of the Note payments, he was a party to two contracts that did so. At a minimum, such conduct should constitute waiver or grounds for estoppel. Waiver and estoppel are available to defeat rejection by operation of §365(d)(4). *See, e.g.,* In re VMS Nat'l Properties, 148 B.R. 942 (Bankr. C.D. Cal.1992)(citing numerous cases including In re Car–Gill, Inc., 125 B.R. 133 (Bankr. E.D. Pa.1991), In re Austin, 102 B.R. 897 (Bankr. S.D. Ga. 1989); In re T.F.P. Resources, Inc., 56 B.R. 112 (Bankr. S.D.N.Y. 1985)). There is no reason why waiver of §365(d)(1) should not be governed by the same principles. See Bankruptcy Law Manual § 9.47 (considering waiver of §§ 365(d)(1) and (d)(4) together).

The following are "the requirements of a waiver: (1) the existence at the time of the waiver of a right, privilege, advantage or benefit; (2) the actual or constructive notice thereof; and (3) the intention to relinquish such right, privilege, advantage or benefit." In re George, 177 F.3d 885 (9th Cir. 1999)(quoting VMS, 148 B.R. at 944); *see also* In re THW Enters., 89 B.R. 351, 356 (Bankr. S.D.N.Y. 1988) (defining a waiver as "an intentional relinquishment of a known right"). It is at least arguable that Debtor's entering into the Fraudulent Transfer Settlement Agreement and Litigation Agreement with the Trustee -- both agreements allocating rights under the Sales Agreement -- met the requirements for waiver of any rights Debtor *might* have to enforce §365(d)(1). The case law typically considers waiver by the non-debtor *parties* to contracts (not debtors),

which underscores how poorly Debtor's argument that he is a beneficiary of §365(d)(1) fits into the framework of §365. However, because this Court has determined, as set forth above, that the Sales Agreement is non-executory and that deemed rejection would not, in any event, remove the Sales Agreement from the estate, the Court will not devote further analysis to this issue.

The Sales Agreement is not an executory contract. Even if it were and the contract was deemed rejected by operation of law, rejection of that contract simply constitutes a breach as of the filing of the petition. Rejection is not abandonment by the estate and does not revest the Sales Agreement and rights thereunder in Debtor. Furthermore, after the petition date, Debtor entered into a binding agreement allocating 65% of the Salary Payments to the Trustee and acknowledging the allocation of 65% of Note payments to Trustee. Debtor's motion to compel abandonment is denied.

## Trustee's FRBP 9019 Motion to Approve Compromise

Motion

Debtor, Trustee and Erika's chapter 7 trustee filed an arbitration against the Purchasers to enforce the various agreements. A settlement has now occurred, which the parties wish this court to approve. In June, Debtor, Erika's trustee, the Trustee, SPNW, SDN, and the Backstroms entered into a settlement agreement ("2012 Settlement Agreement"). Basically SPNW, SDN and each of the Backstroms will sign and deliver a Confession of Judgment in favor of Debtor, the Trustee and Erika's trustee in the amount of $1.9 million plus interest to accrue. With respect to the Backstroms, this is only on behalf of their individual property and not their marital communities. Debtor, the Trsutee and Erika's trustee reserve their claims against the Backstroms'

marital communities.  A mediation will take place within 60 days to establish the amount

of the judgment ultimately to be paid and the form/manner of payment.  Debtor, the

Trustee and Erika's trustee  have not determined how to divide any proceeds as

between the Salary Payments and the Note Payments.  (The two trustees have

tentatively agreed that monies received should be split 65% to Robert's Estate and 35%

to Erika's Estate, but any final agreement on allocation will be subject to bankruptcy

court approval.).  Trustee testifies that, in his business judgment, the proposed

compromise is fair and reasonable and also that it in the best interests of the estate.

*See* Declaration of David Hagen annexed to the Motion for authority to compromise.


Debtor's Limited Opposition

        Debtor does not object to the amount, but he does not believe that the Note is an

asset of the estate because Trustee did not assume the Sale Agreement in a timely

manner.  (Debtor accordingly brought a motion to compel abandonment discussed

above.)  He also raises the following other difficulties with the 2012 Settlement

Agreement:

-        Erika and her estate have no interest in the Note.

-        Trustee's motion is premature because there is a dispute as to who are

        the proper parties to the confessed judgment.

-        Debtor never agreed to pay 100% of the mediation expenses.

-        The settlement does not deal with the issue of possible claims against

        the Backstroms' community property interests.

-        There is no evidence of the Backstroms' ability to make payments.

Debtor wants the Court to approve the Confession of Judgment for $1.9 million, but

-18-

1   reserve jurisdiction to resolve who are the proper parties as well as the distribution of

2   the proceeds.

3

4                    Analysis and Ruling on Motion to Approve Compromise

5

6          For the reasons discussed above, the Court has ruled that the Sales Agreement

7   is not an executory contract and so was not rejected by Trustee under §365(d)(1).  Nor

8   would Debtor obtain rights to these contracts upon rejection.  Thus, rights to payment

9   under the Sale Agreement are property of the estate, which Trustee has authority to

10  compromise.

11         "The purpose of a compromise agreement is to allow the trustee and the

12  creditors to avoid the expenses and burdens associated with litigating sharply contested

13

14  and dubious claims." Martin v. Kane (In re A&C Properties), 784 F.2d 1377, 1380-81

15  (9th Cir. 1986).  Before approving a settlement agreement, the bankruptcy court is

16  charged with considering the "fairness, reasonableness, and adequacy" of the

17  agreement. Id. at 1381.

18         The Court agrees with the Trustee's judgment that the proposed compromise is a

19
20  fair and reasonable one and in the best interests of the estate.  Although there is no

21  certainty of collection under the terms of the 2012 Settlement Agreement, there will be a

22  confession of judgment for $1.9 million.  There is no guarantee of success in litigation

23
24  and no more certainty of collection.  Litigation counsel on this matter has testified that

25  litigation would most likely result in a judgment of $1.6 to $2.2 million.  See Declaration

26  of Adam R. Asher annexed to the Motion for Authority to Compromise.   So this

27  settlement is squarely within the range of an expected judgment, but without the

28  expenses of litigation.  It is not clear what portion of the Backstroms' assets are in their

marital communities (and not a part of this settlement), but the Trustee has reserved his

rights in this regard.  The 65%-35% agreement follows the prior settlement agreements

which divide things in that proportion, but the motion is not asking the Court to

determine the distribution at this time.   As to any issues that Erika has against the

trustee in her bankruptcy case, she needs to deal with those in that case.  Trustee's

motion for authority to compromise is granted.

###

DATED: September 28, 2012

United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): ) **MEMORANDUM OF OPINION REGARDING  MOTION TO DISALLOW THE CLAIM OF ERIKA SJOQUIST [DOCKET 99], MOTION TO COMPEL TRUSTEE TO ABANDON [DOCKET 102], AND MOTION TO COMPROMISE [DOCKET 108]**
was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner stated below:

**1.    SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** – Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of (*date*)_____, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below.

Michael Kwasigroch Email: attorneyforlife@aol.com
Susan Salehi Email: salehilaw@aol.com
Brad Krasnoff Email: krasnoff@lbbslaw.com
Scott Lee Email: slee@lbbslaw.com
Parisa Fishback Email: pfishback@fishbacklawgroup.com
David Hagen Email: drh@forbankruptcy.com
Jeffrey Hagen Email: jeff@hagenlaw.com
William Malcolm Email: bill@mclaw.org
Dennis E. Mcgoldrick Email: dmcgoldricklaw@yahoo.com
Brian A. Paino Email: ecfcacb@piteduncan.com
Kelly Ann Tran Email: ktran@mkblaw.com
Gilbert Weisman Email: notices@becket-lee.com
William Winfield Email: wwinfield@nchec.com
Jerome A. Yelsky Email: yelsky@cherinandyelsky.com

☐   Service information continued on attached page

**2.    SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:

**Robert Sjoquist** 7310 Varna Ave. No Hollywood, CA 91605
David Farmer Chapter 7 Trustee, P.O. Box 1443, San Luis Obispo, CA 93406
Adam Asher, Two Union Square, 601 Union Street, Suite 4950, Seattle, WA 98101-3951
Erika Sjyquist, 912 Sudario Court, Camarillo, CA 93010

☐   Service information continued on attached page

**3.    TO BE SERVED BY THE LODGING PARTY:** Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by United States mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following persons and/or entities at the addresses, facsimile transmission numbers, and/or email addresses stated below:

☐   Service information continued on attached page